1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10   KEITH S. PONCE,                )   Case No. CV 05-7011 GW (JC)
                                    )
11                 Petitioner,      )   REPORT AND RECOMMENDATION
                                    )   OF UNITED STATES MAGISTRATE
12        v .                       )   JUDGE
                                    )
13   JAMES E. HALL,                 )
                                    )
14                 Respondent.      )
                                    )
15   _____  )

16        This Report and Recommendation is submitted to the Honorable

17   George H. Wu, United States District Judge, pursuant to 28 U.S.C. § 636 and

18   General Order 05-07 of the United States District Court for the Central District of

19   California.

20   **I.    SUMMARY**

21        On September 27, 2005, petitioner Keith S. Ponce ("petitioner"), a

22   California state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas

23   Corpus ("Petition") pursuant to 28 U.S.C. § 2254 with accompanying exhibits

24   ("Petition Ex."), including declarations of petitioner ("Petitioner's Declaration

25   [Decl.]" or "Petition Ex. A") and an alleged alibi witness, Sandra Salmeron

26   ("Salmeron Declaration [Decl.]" or "Petition Ex. B").[1]  Petitioner challenges a

27

28 _____

        [1]Petitioner has included both a handwritten and typed version of the Salmeron
   Declaration.  (Petition Ex. B).  The references to such declaration herein are to the typed version.

conviction and sentence in the Los Angeles County Superior Court on the following grounds:   (1) he did not have effective assistance of counsel in entering a plea of no contest to a robbery charge and in admitting a personal firearm use enhancement; (2) he was deprived of the effective assistance of counsel because of a conflict of interest between he and his attorney and because his attorney failed diligently and adequately to investigate the case.

On January 27, 2006, respondent filed an Answer and a supporting memorandum ("Answer").[2]  Petitioner did not file a Reply.

For the reasons stated below, the Petition should be denied, and this action should be dismissed with prejudice.

## II.   PROCEDURAL HISTORY

On February 25, 2002, the District Attorney for the County of Los Angeles filed an Information charging petitioner and co-defendant Daniel Munoz ("co-defendant" or "Munoz") with six counts of second degree robbery (Counts 1-4, 6-7) and two counts of attempted robbery (Counts 5, 8).  (CT 224-31).  The Information further alleged:  (1) the victims of the robberies charged in Counts 2 and 4 were over 65, as petitioner and his co-defendant knew or reasonably should have known (Cal. Penal Code § 667.9(a)); (2) petitioner and his co-defendant personally used a firearm in the commission of all of the charged offenses (Cal. Penal Code § 12022.53(b)); (3) a principal was armed with and personally used a firearm in the commission of all of the charged offenses (Cal. Penal Code §§ 12022(a)(1), 12022.53(b), 12022.53(e)(1)); (4) all of the charged offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members (Cal. Penal Code § 186.22(b)(1)); and (5) petitioner had

---

[2]Respondent concurrently lodged multiple documents in support of the Answer ("Lodged Doc.") including the Clerk's Transcript ("CT"), the Reporter's Transcript ("RT"), and the Reporter's Augmented Transcript ("RAT").

previously suffered a serious or violent felony or juvenile adjudication for robbery which qualified as a strike (Cal. Penal Code §§ 1170.12(a)-(d), 667(b)-(i)) and as a prior serious felony conviction (Cal. Penal Code § 667(a)(1)).  (CT 224-31).

On February 28, 2003, petitioner, pursuant to a plea agreement, pleaded no contest to one count of robbery (Count 3), admitted that he had personally used a firearm in the commission of such offense (Cal. Penal Code § 12022.53(b)), and admitted that he had suffered a prior strike (Cal. Penal Code §§ 1170.12(a)-(d), 667(b)-(i)).  (CT 263-66; RT D1-D13).  On the same date, in accordance with the terms of the plea agreement, the trial court sentenced petitioner to fourteen (14) years in state prison and dismissed the remaining counts and allegations.  (CT 264-65, 268; RT D18-D19).[3]

Petitioner filed a Notice of Appeal and was granted a certificate of probable cause permitting him to appeal.  (CT 269-269A; Lodged Doc. D10 at 9 n.5).  On direct appeal, petitioner argued, through counsel, that his trial counsel's lack of pretrial preparation rendered any advice that she gave to him regarding a plea unreliable, and accordingly, that his plea should be set aside.  (Lodged Doc. D1; Lodged Doc. D10 at 9).[4]  The California Court of Appeal affirmed the judgment in a reasoned decision, finding  "no evidence in the appellate record that trial counsel failed to investigate the validity of an enhancement or some other element of the plea bargain[,]" "no evidence that trial counsel failed to prepare the case sufficiently for trial so that her advice to [petitioner] about whether or not to accept the plea bargain was unreliable[,]" and "no facts establishing that trial

---

[3]According to the pre-plea probation report, petitioner was 19 years old when he committed the offense, he had three prior juvenile contacts apart from his juvenile adjudication of robbery, and he had previously been committed to the camp-community placement program. (Lodged Doc. D10 at 2).

[4]The declarations of petitioner and Salmeron (Petition Exs. A and B) do not appear to have been part of the record on direct appeal.

3

counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." (Lodged Doc. D10 at 10). The California Supreme Court denied review without comment. (Lodged Doc. D14).

Petitioner, through counsel, also sought habeas relief in the California Court of Appeal. (Lodged Docs. D5-D9).[5] Petitioner argued that he was deprived of the effective assistance of counsel due to a conflict of interest and counsel's failure adequately to investigate the case and determine if there were any alibi witnesses to the charges – all of which precluded such counsel from providing effective assistance before and at the time petitioner entered his no contest plea. (Lodged Doc. D5). The Court of Appeal denied relief, concluding that petitioner had failed to establish a prima facie case of ineffective assistance of counsel. (Lodged Doc. D11). Petitioner, through counsel, thereafter sought review in the California Supreme Court. (Lodged Doc. D12). After directing respondent to file an answer to the petition for review and considering such answer and petitioner's reply thereto, the California Supreme Court denied review without comment. (Lodged Docs. D15-D18).

## III.   FACTS[6]

### A.   Preliminary Hearing

The preliminary hearing evidence showed that four Vaughn Street gang members engaged in a robbery spree between the hours of 2:00 and 10:00 p.m. on August 31, 2001, in the Sherman Oaks, North Hollywood, and Studio City areas of Los Angeles.

---

[5]The declarations of petitioner and Salmeron (Petition Exs. A and B) were part of the record on habeas review. (Lodged Doc. 5). A letter from petitioner's counsel responding to petitioner's allegations ("Counsel's Letter") was also part of the record on habeas review. (Lodged Doc. 5, second to last page [unnumbered]).

[6]Unless otherwise indicated, the facts set forth in Parts IIIA and IIIB are drawn from the California Court of Appeal's decision on direct appeal. (Lodged Doc. D10). Such factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).

At 2:00 p.m. on August 31, 2001, Steven Barnes was standing next to his car in front of his residence in the 3900 block of Berry Drive in Studio City, just off Laurel Canyon Boulevard. Two Hispanic youths, with faces covered, robbed Barnes of his wallet and his cellular telephone by use of a gun similar to that in Exhibit No. 1.[7]  (Count 1).

At 8:00 p.m. that night, two youths, approximately ages 13 to 15 and 19 to 20, robbed Ashwin Joshi as he drove into his residence's garage on Murietta Avenue in Sherman Oaks. During the robbery, the older youth used a handgun that looked "remarkably similar" to the handgun in court, Exhibit No. 1. The youths took Joshi's wallet, money, cellular telephone, and organizer. (Count 7).

At 8:15 p.m.,[8] two age 15-to-18-year-old youths attempted to rob the valets behind Maria's Italian Restaurant located at 13353 Ventura Boulevard. In postarrest six-pack identification procedures, valet Jose Garcia identified petitioner as the robber with the handgun and said that Munoz "look[ed] like" the other robber. (Count 8).

At 8:30 p.m., four youths ranging in age from approximately 13 to 18 years entered the office of the Patio Motel at 11466 Ventura Boulevard in Studio City and attempted to rob Alma Garcia. At the preliminary hearing and during postarrest six-pack identification procedures, Garcia identified Munoz and petitioner as two of the robbers. Garcia also identified a striped gray and navy polo shirt that was recovered later at the Barrera residence as the shirt Munoz was wearing during the robbery. During the robbery, Munoz pointed a dark handgun
///

_____

[7]The probation report indicates that Barnes had $1000 in cash in his possession when he was robbed.

[8]Although the factual summary from the California Court of Appeal opinion reflects that the offense charged in Count 8 took place at 8:45 p.m., testimony at the preliminary hearing reflects that it occurred at 8:15 p.m. (CT 59).

at her head.  She heard a click from the gun, and she believed that she was dead.
(Count 5).

At about 9:45 p.m., two Hispanic youths took Garth Grinde's cellular
telephone from him in the mall parking lot at 11440 Ventura Boulevard in Studio
City.  One of the youths used a handgun that "matched" Exhibit No. 1.  At the
preliminary hearing, Grinde identified Munoz as the gunman and identified a
white T-shirt with a logo recovered later at the Barrera residence as the shirt worn
by the other robber.  (Count 6).

At approximately 9:50 p.m., a car stopped in the alley behind Ilene Satre's
Arcola Avenue, Toluca Lake apartment as she was arriving home at her kitchen
door.  Two youths got out of the car and approached her.  After displaying a
handgun, the youths took her purse.  At the preliminary hearing, Satre said that
Munoz resembled the robber with the gun.  (Count 2).

At about 9:50 p.m., two youths, about ages 13 and 20, confronted Daniel
Sheahan with a gun as he was getting out of his car in the driveway of his
residence in the 10800 block of Peach Grove in North Hollywood.  When the
youths demanded Sheahan's wallet, he complied.  One youth struck him in the
face.  (Count 4).

Shortly after 10:00 p.m., two youths approached Patricia Roy as she pulled
her car into her driveway in the 11100 block of Kling Street in North Hollywood.
By the use of a handgun that was similar in appearance to Exhibit No. 1, the
youths took Roy's purse, which contained her cellular telephone.  She tentatively
identified petitioner in a field identification procedure.  At the preliminary hearing,
she was certain that petitioner was one of the robbers.  (Count 3).

The descriptions that the victims gave of the robbers' clothing, heights,
weight, ages, and shaved heads made it appear to the police that four gang youths
had been engaged in an afternoon and evening robbery spree.  At 10:25 p.m., Los
Angeles Police Officers Carlos Camacho and his partner Hyung Cho were driving

westbound on Camarillo Street near Tujunga Avenue in North Hollywood when they passed an eastbound Camry occupied by four Hispanic youths with shaved heads.  The officers suspected the youths were the robbers.  They made a U-turn, and the Camry sped off with Camacho and Cho in pursuit.

The Camry took a convoluted route to Riverton Avenue and Magnolia Boulevard, where the officers lost it.  A bystander told them that north of Magnolia Boulevard, where Riverton Avenue dead-ends before reaching Chandler Boulevard, three of the youths in the Camry got out and jumped the fence.  The driver parked the Camry in the apartment building at 533 Riverton Avenue.

Camacho and Cho found the Camry and searched it.  The Camry had paper plates and its temporary used car registration was in petitioner's name.  Roy's cellular telephone was on the front seat along with Munoz's California identification card.  Several hours later, Munoz and another juvenile, "Anthony," were found nearby inside a police perimeter at Angelica Barrera's residence at 10743 Cumpston Street.  Clothing worn by the robbers was found in the Barrera's laundry room, where Munoz and Anthony apparently had hidden it.

In the same area, at 10:40 p.m., police officers were setting up a perimeter just south of Burbank Boulevard on Satsuma Avenue.  Petitioner ran out of an industrial park westbound in front of the officers.  He saw the police car, and backtracked.  After a foot pursuit, petitioner was arrested.  He had the keys to the green Camry.

The next morning, on September 1, 2001, Zinoid Beigel found Exhibit No. 1, a loaded, steel blue automatic handgun, at the corner of Huston Street and Tujunga Avenue, which was along the route that the green Camry took in flight from Camacho and Cho.

///

///

///

After Munoz's arrest, Munoz waived his <u>Miranda</u> [9] rights.   He admitted that he and petitioner were involved in the August 31, 2001 robbery spree and that petitioner was driving.  Munoz said that sometimes petitioner waited in the car and that sometimes petitioner and Anthony committed robbery together.

A local gang officer testified that he was personally aware that petitioner and Munoz were Vaughn Street gang members.  The gang was involved in the commission of felony offenses, and the gang officer gave his opinion that the August 31, 2001 robbery spree was committed for the benefit of a criminal street gang.

### B.    Plea

The People intended to try petitioner and Munoz in the same proceeding. Prior to trial, the People made an offer of a plea bargain.  Pursuant to the offer, petitioner would plead no contest to Count 3, the robbery of Patricia Roy, with admissions of the use of a firearm and to his conviction of robbery, for a prison term of 14 years, consisting of a doubled, lower term of four years, enhanced by 10 years for the use of the firearm.  Petitioner was to make actual restitution to the victims as determined at a later hearing.  He would waive his "appellate rights" and his right to presentence credits, including conduct credits.  Munoz was offered a similar plea bargain; because he had no prior serious or violent felony conviction or adjudication, his aggregate prison term was to be 12 years.

Comments by petitioner's trial counsel during the proceedings indicated that Munoz was amenable to a plea, but petitioner was resistant.  As the jury arrived to commence voir dire, petitioner's counsel told the prosecutor that petitioner would enter into the plea bargain if he was offered a 12-year prison term.  The prosecutor refused petitioner's counteroffer.  Petitioner personally complained to the trial court that with the present 14-year offer, he would not be released from prison

---

[9]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

until he was 35 years old.  The trial court told petitioner that being discharged from prison at age 35 was far better than being discharged from prison at age 85, assuming that petitioner was convicted during a trial of the charges and that he was sentenced to a maximum prison term.

The following day, before voir dire commenced, petitioner's counsel indicated that petitioner had decided to enter a plea pursuant to the 14-year plea bargain.  The prosecutor advised petitioner and Munoz of the requisite constitutional rights and obtained a waiver of rights.  The prosecutor also advised the petitioner and Munoz on the record of the nature and consequences of their pleas.  Petitioner and Munoz then entered their pleas of no contest and made the required admissions.  The prosecutor asked petitioner's counsel if she had fully advised petitioner of his constitutional rights and of the nature of his plea, and she said that she had.  Petitioner's counsel stipulated that there was a factual basis for the plea and indicated that the plea was entered pursuant to People v. West, 3 Cal.3d 595 (1970).[10]

The prosecutor told petitioner that if he did not want to proceed with the plea, they had a jury waiting, and they could proceed with the trial.

Following the entry of the plea, the trial court sentenced petitioner and Munoz pursuant to the plea bargain, respectively, to aggregate state prison terms of 14 and of 12 years.

### C.    The Alleged Alibi Witness and Alleged Conflict of Interest

In Petitioner's Declaration, petitioner attests in pertinent part:   On or about May 1, 2002 (approximately eight months after he was arrested and approximately three months after the preliminary hearing), he retained his trial counsel, Nancy Mazza, to represent him in the underlying criminal case.  (Petitioner's Decl. ¶ 3).

---

[10]People v. West does not require an admission of guilt and is the California equivalent of an Alford plea.  Doe v. Woodford, 508 F.3d 563, 566 n.2 (9th Cir. 2007) (citing North Carolina v. Alford, 400 U.S. 25 (1970)).

She promised petitioner that she would get him a deal for receiving stolen property. (Petitioner's Decl. ¶ 2). She asked petitioner to secure her cases, gave him a stack of business cards to hand out in prison, and asked petitioner about cases about once a week. (Petitioner's Decl. ¶ 2). Petitioner secured a case for her. (Petitioner's Decl. ¶ 2). Petitioner advised Mazza that he had been with his girlfriend, Sandra Salmeron, all day and into the evening on August 31, 2001, the date the robberies in issue occurred. (Petitioner's Decl. ¶ 4). At around 8:30 p.m. that night, he received a telephone call and left his home. (Petitioner's Decl. ¶ 4). He told Mazza that Salmeron could provide an alibi for him because he had been with her during the time most of the robberies occurred. (Petitioner's Decl. ¶ 4). He provided Mazza with Salmeron's telephone number and address. (Petitioner's Decl. ¶ 4). Mazza agreed to contact Salmeron. (Petitioner's Decl. ¶ 4). Mazza told petitioner that Salmeron was not cooperating. (Petitioner's Decl. ¶ 4). It was apparent to petitioner at the time he pleaded nolo contendere that Mazza was not going to effectively prepare and present an alibi defense to any of the charges and, therefore, that he could not proceed to trial with any chance of success on any of the counts since his counsel had not diligently investigated the case. (Petitioner's Decl. ¶ 6).

In Salmeron's Declaration, Salmeron attests in pertinent part: She began living with petitioner in mid-August 2001 – two weeks before the incidents in issue. (Salmeron Decl. at 1). On August 31, 2001, the day in issue, she was with petitioner the whole day until around 8:30 p.m., when he left with some friends. (Salmeron Decl. at 1). Around 8:15 p.m., a car drove up in front of the house. (Salmeron Decl. at 2). Petitioner recognized the occupants of the car and went outside. (Salmeron Decl. at 2). Some time around 8:30 p.m., petitioner came back into the house and told her he was going to one of his friend's house to hang with them and would be back in a little while. (Salmeron Decl. at 2-3). When petitioner did not come home, she started calling around. (Salmeron Decl. at 3).

At around 10:00 p.m. petitioner returned her page and told her he would be coming home soon, but never made it. (Salmeron Decl. at 3). She next saw petitioner about two weeks later when she went to visit him in jail. (Salmeron Decl. at 3). At no time did petitioner's attorney interview her.[11] (Salmeron Decl. at 3). She was never contacted by the police or any other investigators. (Salmeron Decl. at 3). She visited petitioner in jail for the next several months and went on with her life. (Salmeron Decl. at 3).

In petitioner's Counsel's Letter, Mazza asserts: She did investigate petitioner's alibi. The alibi was of no help since petitioner was caught in his car at the end of the string of robberies with numerous items in his car from the robberies. Had petitioner been found guilty of only one robbery, he would have done a lot more time than called for by the plea. Petitioner wanted to plead guilty. Petitioner's allegation that she would have gotten him a better deal if he got her more cases was absolutely false and was never discussed. That would have been completely unethical and she would never do such a thing. A plea to a charge lesser than robbery was not available. She did not "do 'dispo's' in exchange for cases[,]" calling it "absurd." (Counsel's Letter [Lodged Doc. D, second to last page]).

## IV.  STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any

---

[11]Salmeron does not state whether petitioner's counsel contacted her, attempted to interview her and/or attempted to persuade Salmeron to cooperate. Nor does Salmeron state whether she was available and/or willing testify and cooperate prior to or at the time petitioner entered his no contest plea.

claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:  (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[12]

"[C]learly established Federal law" refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  In the absence of a Supreme Court decision that "squarely addresses the issue" in the case before the state court, Wright v. Van Patten ("Van Patten"), 552 U.S. 120, 125 (2008), or establishes an applicable general principle that "clearly extend[s]" to the case before a federal habeas court to the extent required by the Supreme Court in its recent decisions, Van Patten, 552 U.S. at 123; see also Panetti v. Quarterman, 551 U.S. 930, 953 (2007); Carey v. Musladin ("Musladin"), 549 U.S. 70, 76 (2006), a federal habeas court cannot conclude that a state court's adjudication of that issue resulted in a decision contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2009) (citing Van Patten, 552 U.S. at 126).

"Under § 2254(d), a habeas court must determine what arguments or theories supported, . . . or could have supported, the state court's decision; and

---

[12]The California Supreme Court's denial of review without comment is generally presumed to constitute an adjudication on the merits of any federal claims, thereby subjecting such claims to review in federal habeas proceedings. See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992) (California Supreme Court's unexplained denial of habeas petition constitutes decision on the merits of federal claims subjecting such claims to review in federal habeas proceedings), cert. denied, 510 U.S. 887 (1993).

1  then it must ask whether it is possible fairminded jurists could disagree that those

2  arguments or theories are inconsistent with the holding in a prior decision of this

3  Court." Harrington v. Richter ("Richter"), 131 S. Ct. 770, 786 (2011). This is

4  "the only question that matters under § 2254(d)(1)." Id. (citation and internal

5  quotations omitted). Habeas relief may not issue unless "there is no possibility

6  fairminded jurists could disagree that the state court's decision conflicts with [the

7  United States Supreme Court's] precedents." Id. at 786–87 ("As a condition for

8  obtaining habeas corpus from a federal court, a state prisoner must show that the

9  state court's ruling on the claim being presented in federal court was so lacking in

10  justification that there was an error well understood and comprehended in existing

11  law beyond any possibility for fairminded disagreement.").

12  In applying the foregoing standards, federal courts look to the last reasoned

13  state court decision. See Davis v. Grigas, 443 F.3d 1155, 1158 (9th Cir. 2006)

14  (citation and quotations omitted). "Where there has been one reasoned state

15  judgment rejecting a federal claim, later unexplained orders upholding that

16  judgment or rejecting the same claim rest upon the same ground." Ylst v.

17  Nunnemaker, 501 U.S. 797, 803 (1991); see also Gill v. Ayers, 342 F.3d 911, 917

18  n.5 (9th Cir. 2003) (federal courts "look through" unexplained rulings of higher

19  state courts to the last reasoned decision). However, to the extent no such

20  reasoned opinion exists, courts must conduct an independent review of the record

21  to determine whether the state court clearly erred in its application of controlling

22  federal law, and consequently, whether the state court's decision was objectively

23  unreasonable. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); see also

24  Richter, 131 S. Ct. at 784 ("Where a state court's decision is unaccompanied by an

25  explanation, the habeas petitioner's burden still must be met by showing there was

26  no reasonable basis for the state court to deny relief."); Cullen v. Pinholster, 131

27  S. Ct. 1388, 1402 (2011) ("Section 2254(d) applies even where there has been a

28  summary denial.") (citation omitted).

13

1    When it is clear, however, that the state court has not reached the merits of a

2    claim, review of such claim is *de novo*.  <u>Cone v. Bell</u>, 129 S. Ct. 1769, 1784

3    (2009); <u>Reynoso v. Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006).  Similarly, if a

4    federal habeas court concludes that a state court's decision was contrary to, or an

5    unreasonable application of clearly established Supreme Court law or was based

6    on an unreasonable determination of the facts in light of the evidence presented,

7    review is *de novo*.  <u>Panetti v. Quarterman</u>, 551 U.S. at 948; <u>Maxwell v. Roe</u>, 628

8    F.3d 486, 494-95 (9th Cir. 2010), <u>petition for cert filed</u> (June 21, 2011) (No. 10-

9    1548); <u>Frantz v. Haney</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

10   **V.    DISCUSSION**

11   Petitioner essentially claims that his plea was not knowing and intelligent

12   because it was based on the advice of counsel who was ineffective in that such

13   counsel failed adequately to investigate an alibi witness and had a conflict of

14   interest with petitioner.  Petitioner is not entitled to federal habeas relief on such

15   claims.

16   **A.    Pertinent Law**

17   Due process requires that a guilty plea be knowing, intelligent, and

18   voluntary.  <u>Boykin v. Alabama</u>, 395 U.S. 238, 242-43 (1969); <u>see also</u> <u>Little v.</u>

19   <u>Crawford</u>, 449 F.3d 1075, 1080 (9th Cir. 2006), <u>cert. denied</u>, 551 U.S. 1118

20   (2007).  Counsel's advice enters into the determination of intelligence.  <u>Langford</u>

21   <u>v. Day</u>, 110 F.3d 1380, 1385 (9th Cir. 1996), <u>cert. denied</u>, 522 U.S. 881 (1997).  A

22   guilty plea based on an attorney's advice may not to knowing, intelligent and

23   voluntary if the attorney rendered ineffective assistance.  <u>Hill v. Lockhart</u>, 474

24   U.S. 52, 56-57 (1985).

25   In order to show that counsel was ineffective, petitioner must demonstrate

26   that (1) defense counsel's representation "fell below an objective standard of

27   reasonableness," and (2) counsel's deficient performance prejudiced petitioner

28   such that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceedings would have been different."  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).  As both prongs of the Strickland test must be satisfied to establish a constitutional violation, failure to satisfy either prong requires that an ineffective assistance claim be denied.  See Strickland, 466 U.S. at 697 (no need to address deficiency of performance if prejudice is examined first and found lacking); Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the Strickland test obviates the need to consider the other.").

The first prong of the Strickland test – deficient performance – requires a showing that, in the light of all the circumstances, counsel's performance was "outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.

The second prong of the Strickland test – prejudice – requires a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 131 S. Ct. at 792.

The Strickland standard applies in the plea context.  Hill, 474 U.S. at 58. With respect to guilty pleas, the "prejudice" requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process."  Id. at 59.  "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Id.; see also Washington v. Lampert, 422 F.3d 864, 873 (9th Cir. 2005), cert. denied, 547 U.S. 1074 (2006).

///

///

**B.**   **Trial Counsel's Alleged Failure to Investigate Alibi Witness**

Petitioner essentially contends that his trial counsel was ineffective because she "failed to contact Sandra Salmeron, petitioner's girlfriend, and failed to discover that [Salmeron] could have provided an alibi defense, at least to several of the counts." (Petition at 10a). He asserts that had his attorney investigated the alibi presented by Salmeron and called her as a witness, petitioner would not have pleaded no contest. (Petition at 10a). Petitioner is not entitled to federal habeas relief on this claim as he fails to show that his counsel was deficient or that he was prejudiced by counsel's conduct.

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. When the failure to investigate involves the failure to interview and/or call a particular witness, the petitioner must identify the witness and state with specificity what the witness would have testified to and how that testimony might have altered the outcome of the trial. United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987). Further, the petitioner must show that the witness was actually available and willing to testify. United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir.), cert. denied, 488 U.S. 910 (1988).

First, petitioner does not demonstrate that his counsel failed contemporaneously to contact or to attempt to contact, interview and enlist the cooperation of Salmeron. Petitioner's counsel has asserted that she did in fact investigate petitioner's alibi. (Counsel's Letter [Lodged Doc. 5, second to last page]). Petitioner attests that Mazza told him that Salmeron was not cooperating. (Petitioner's Decl. ¶ 5). Although Salmeron attests that petitioner's counsel did not actually interview her, she does not deny that petitioner's counsel contacted her or that Mazza attempted to contact her, interview her and obtain her cooperation. (Salmeron Decl.). Indeed, even though Salmeron visited petitioner for several months after the August 31, 2001 incidents (Salmeron Decl. at 3), she

admittedly "went on with [her] life" (Salmeron Decl. at 3), and, according to petitioner, was not in touch with petitioner at the time Mazza (who did not begin representing petitioner until May 2002 – several months after the August 31, 2001 incidents) advised him that Salmeron was not cooperating.  (Petitioner's Decl. ¶ 5).  Neither the substance of the Salmeron Declaration, nor the fact that Salmeron was apparently willing to be cooperative in February 2004 when she signed the declaration, demonstrate that Salmeron was available and willing to cooperate and to testify on petitioner's behalf at the time in issue.

Second, petitioner fails to rebut the presumption that Mazza's investigation was reasonable given the facts and circumstances.  On Mazza's advice, petitioner pleaded no contest to Count 3 – a robbery which occurred at approximately 10:00 p.m. (CT 30-31), and was supported by a positive eyewitness identification of petitioner by the victim, petitioner's possession of keys to a car in which the victim's cell phone was recovered, and petitioner's flight from the police, suggesting a consciousness of guilt.  Accepting the entire substance of Salmeron's Declaration as true and assuming that she testified to the same information at trial, she would not have provided petitioner with an alibi for this offense because petitioner admittedly left her around 8:30 p.m.  The same is true for the robberies/attempted robberies charged in at least three other counts which occurred at 9:45 p.m. (Count 6) and 9:50 p.m. (Counts 2 and 4), *i.e.*, after 8:30 p.m.  (CT 10-14, 23-27, 118-119).  Moreover, as Salmeron's Declaration provides only approximate times (indicating that petitioner left "around 8:30 p.m."), her testimony would have provided less than an airtight alibi on three of the four remaining additional robberies (Counts 5, 7 and 8) which occurred between approximately 8:00 and 8:30 p.m.  (CT 57-58, 87-90, 114).  Thus, it is reasonable to conclude that Salmeron's testimony could have afforded petitioner a relatively firm alibi only as to the robbery charged in Count 1 which occurred at around 2:00 p.m. – around the time Salmeron, who had assertedly been driven by petitioner,

was seeing an eye doctor.[13]  As petitioner admittedly told Mazza that he had left
Salmeron around 8:30 p.m. (albeit in response to a phone call he received as
opposed to a visit as attested to by Salmeron), and in light of the foregoing facts
and timing and petitioner's potential exposure on the counts as to which Salmeron
could provide no alibi or at best a marginal alibi, it was not unreasonable for
Mazza not to further investigate the matter.  Rather, in light of the weight of the
evidence against petitioner on at least Count 3 (summarized above), the fact that
victims in two other robberies/attempted robberies (Counts 5 and 8) also identified
petitioner as one of individuals who robbed them  (CT 35, 87, 92-93, 199-200),
petitioner's flight from the police, his possession of keys to a car from which
multiple suspects fled and in which petitioner's identification, Munoz's
identification and a cell phone belonging to a robbery victim was found (CT 133,
140, 144-46, 148-49), and petitioner's potential 65-year exposure if convicted of
all of the charged offenses (RT C2), it was not unreasonable of petitioner's trial
counsel to conclude that further investigation would not be fruitful and to
recommend that petitioner plead no contest to the count on which the prosecution
had the strongest case against petitioner.[14]  Indeed, as petitioner's counsel
indicated, petitioner was facing more than fourteen (14) years – the sentence
imposed under his plea deal – even if he had gone to trial and been convicted by a
jury on a single charge.  (Counsel Letter).[15]

_____

[13]Although Salmeron attests that petitioner drove her to the eye doctor in the early
afternoon of August 31, 2001, she does not state whether petitioner was out of her presence
during the appointment.  If so, her testimony would again provide less than an airtight alibi for
petitioner on the 2:00 p.m. robbery charged in Count 1.

[14]In addition, since Munoz elected to plead guilty and admitted that he and petitioner were
involved in the string of armed robberies (CT 208-13), the prosecution could have called him as
a witness.

[15]As the Court of Appeal noted on direct appeal, a finding on the gang enhancement alone
would have added ten (10) years to petitioner's prison term.  (Lodged Doc. D10 at 2).

Finally, petitioner fails to demonstrate prejudice.  Although petitioner essentially claims he would not have pleaded no contest if his attorney had called Salmeron as a witness, neither the substance of the Salmeron Declaration, nor the fact that Salmeron was apparently willing to be cooperative in February 2004 when she signed the declaration, demonstrate that Salmeron was available and willing to testify on petitioner's behalf at the time in issue.  In the face of the lack of such evidence, the limited utility of such testimony even if it had been available, the strength of the evidence against petitioner on multiple of the charged offenses, and the existence of the robbery spree which suggests that the same individuals were involved in the other charged offenses, petitioner fails to show a reasonable probability that, but for his counsel's alleged errors, he would not have pleaded guilty and would have insisted on going to trial.

In sum, petitioner has failed to demonstrate that his counsel's investigation was unreasonable or that there is any reasonable probability that but for counsel's alleged error he would have passed up the state's plea offer and taken his chances at trial.  Accordingly, under any standard of review, petitioner's ineffective assistance of counsel claim must fail.[16]

## C.    Alleged Conflict of Interest Between Petitioner and Counsel

Petitioner essentially asserts that a conflict of interest existed between he and his counsel because his counsel asked him to solicit potential clients on her behalf while he was in jail and implicitly conditioned her "promise" to secure him a plea deal to a lesser receiving stolen property charge on petitioner's referrals.[17]

---

[16]As petitioner contends that the rejection of this claim by the Court of Appeal – the last state court to issue a reasoned decision on the claim – was based on an unreasonable determination of the facts (Petition at 10c), this Court has alternatively conducted a *de novo* review of such claim and concludes, as noted above, that petitioner is not entitled to relief even under such non-deferential standard of review.

[17]Petitioner reiterates his allegation that counsel failed to interview Salmerson (Petition at 10f-10h), but does not allege that counsel's decision to contact Salmerson was contingent on his

(continued...)

(Petition at 10g).  Petitioner is not entitled to federal habeas relief on this claim.[18]

The Sixth Amendment right to counsel, includes the right to assistance by a conflict-free attorney.  Wood v. Georgia, 450 U.S. 261, 271 (1981); Lewis v. Mayle, 391 F.3d 989, 995 (9th Cir. 2004).  As noted above, a habeas petitioner alleging ineffective assistance of counsel ordinarily must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Mickens v. Taylor, 535 U.S. 162, 166 (2002) (quoting Strickland, 466 U.S. at 694).  However, prejudice may be presumed where a petitioner shows counsel "actively represented conflicting interests."  Mickens, 535 U.S. at 166; Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).[19]

---

[17](...continued)
success in securing clients for his counsel.  Nevertheless, as discussed above, petitioner's contention that his counsel was ineffective in connection with her investigation relative to Salmerson does not merit habeas relief.

[18]Petitioner also argues that counsel "has shown a pattern of conduct in other cases that is both unethical and incompetent."  (Petition at 10i-10n).  Petitioner is not entitled to habeas relief based upon allegations that his attorney was ineffective in other individuals' cases.  See Bonin v. Calderon, 59 F.3d 815, 828-29 (9th Cir. 1995) ("Because the essential inquiry is whether the petitioner received objectively reasonable and conflict-free representation, evidence that the attorney may have erred or acted inappropriately in unrelated cases will normally have little, if any, probative value[.]").  Petitioner is entitled to habeas corpus relief only if he was prejudiced by counsel's deficient performance.  See Hill, 474 U.S. at 58-59.  As explained above, petitioner has not made such a showing.

[19]More specifically, in order for prejudice to be presumed in such a context, a petitioner must demonstrate that an "actual conflict" existed, i.e., that his attorney's performance was adversely affected.  Alberni v. McDaniel, 458 F.3d 860, 872 (9th Cir. 2006), cert. denied, 549 U.S. 1287 (2007).  An adverse effect must be one that "significantly worsens counsel's representation of the client before the court or in negotiations with the government."  United States v. Mett, 65 F.3d 1531, 1535 (9th Cir. 1995), cert. denied, 519 U.S. 870 (1996).  A petitioner must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.  Hovey v. Ayers, 458 F.3d 892, 908 (9th Cir. 2006) (quoting United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005)).  A petitioner must show a "link between deficient performance and the conflict of interest[.]"  Alberni, 458 F.3d at 872.

1

2    In <u>Mickens</u>, the Supreme Court declined to approve the application of a

3 presumed prejudice rule to conflicts other than those caused by the joint

4 representation of two or more defendants.  <u>Mickens</u>, 535 U.S. at 174-75; <u>see also</u>

5 <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1184 (9th Cir. 2005) (<u>Mickens</u> Court "cautioned

6 that its own conflict jurisprudence had not reached beyond joint representation")

7 (citation omitted), <u>cert. denied</u>, 547 U.S. 1159 (2005).  The <u>Mickens</u> Court noted

8 that the lower courts had applied the presumed prejudice rule of <u>Cuyler v. Sullivan</u>

9 "unblinkingly to all kinds of attorney ethical conflicts," including alleged conflicts

10 involving counsel's "personal or financial interests" and "romantic

11 entanglement[s.]"  <u>Mickens</u>, 535 U.S. at 174 (citations and internal quotation

12 marks omitted).  The <u>Mickens</u> Court opined that <u>Cuyler v. Sullivan</u> did not support

13 such an expansive application, and admonished that the purpose of a presumed

14 prejudice rule was "not to enforce the Canons of Legal Ethics. . . ."  <u>Id.</u> at 175-76.

15 "<u>Mickens</u> explicitly concluded that [the presumed prejudice rule of <u>Cuyler v.</u>

16 <u>Sullivan</u>] was limited to joint representation, and that any extension of [<u>Cuyler v.</u>]

17 <u>Sullivan</u> outside of the joint representation at trial context remained, as far as the

18 jurisprudence of [the Supreme Court was] concerned, an open question."  <u>Foote v.</u>

19 <u>Del Papa</u>, 492 F.3d 1026, 1030 (9th Cir. 2007) (quoting <u>Earp</u>, 431 F.3d at 1184

20 and <u>Mickens</u>, 535 U.S. at 176) (internal quotation marks omitted), <u>cert. denied</u>,

21 552 U.S. 1077 (2007).

22    Petitioner does not allege a conflict of interest caused by joint

23 representation.  Rather, petitioner asserts a conflict involving his attorney's

24 personal interests.[20]  In <u>Earp</u>, the petitioner argued that lower courts had applied a

25 ───────────────

26    [20]<u>See</u> <u>also</u> <u>Campbell v. Rice</u>, 408 F.3d 1166, 1170-71 (9th Cir. 2005) (en banc) (affirming

27 district court's denial of habeas petition and holding that state court's determination – that
alleged actual conflict of interest due to the fact that petitioner's attorney was being prosecuted at

28 the same time by the same district attorney's office, did not adversely affect attorney's

(continued...)

presumed prejudice rule to a variety of conflicts, including a conflict stemming from an accusation that the attorney had committed similar crimes for which his client was being prosecuted.  Earp, 431 F.3d at 1184 n.23.  The Ninth Circuit deemed the argument "futile" in light of Mickens because, under the standard of review set forth in 28 U.S.C. § 2254(d), "only Supreme Court holdings are binding on state courts."  Id.  (citations and internal quotation marks omitted) (denying habeas relief where petitioner claimed he had received ineffective assistance of counsel because his intimate relationship with his attorney created an actual conflict of interest).

Here too, because no clearly established Supreme Court law extends the presumption of prejudice to a conflict of interest caused by an attorney's personal interests, such as those alleged with respect to petitioner's counsel, the California Supreme Court's rejection of petitioner's conflict of interest claim could not be "contrary to, or an unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court" unless petitioner establishes prejudice under Strickland.[21]

Here, petitioner's allegations – which petitioner's counsel characterizes as "absurd" (Counsel's Letter) – would not entitle petitioner to relief even if they were accepted as true because petitioner cannot show prejudice under Strickland. There is no basis in the record to conclude that the prosecutor would have offered petitioner a plea to a receipt of stolen property charge, irrespective of any alleged

---

[20](...continued)
performance – was not contrary to or an unreasonable application of clearly established federal law), cert. denied, 546 U.S. 1036 (2005).

[21]The Ninth Circuit's decision in Alberni does not compel a different conclusion.  There, the court determined, inter alia, that the Nevada Supreme Court's conclusion that prejudice could be presumed if a petitioner demonstrates the existence of an actual conflict outside the joint representation context was not contrary to clearly established Supreme Court law because the issue remains an "open question" not yet addressed by the Supreme Court.  Alberni, 458 F.3d at 874.  In the instant case, the California Supreme Court made no such finding.

22

1    or implicit promise by petitioner's counsel to secure such an agreement if

2    petitioner referred clients to her.  <u>See</u> <u>Burger v. Kemp</u>, 483 U.S. 776, 785-86

3    (1987) (rejecting plaintiff's allegation that attorney conflict adversely affected

4    quality of counsel because attorney failed to negotiate plea in absence of evidence

5    that prosecutor would have been receptive to plea bargain).  Not even petitioner's

6    co-defendant Munoz – who, unlike petitioner, was not alleged to have suffered a

7    prior strike conviction – was offered a plea to such a reduced charge.  Munoz

8    received and pleaded guilty to a 12-year plea deal.  (RT D7).  Although petitioner

9    and his counsel attempted to secure the same deal for petitioner, the prosecutor

10    flatly refused to offer petitioner anything less than a 14-year deal.  (RT C1-C2).  In

11    light the absence of any evidence that the prosecutor would have been willing to

12    offer petitioner the plea agreement that his attorney assertedly failed to secure for

13    petitioner because he did not refer her more clients, petitioner cannot show a

14    reasonable probability that the alleged conflict prejudiced him.

15         As the California courts' rejection of petitioner's claim was neither contrary

16    to, nor involved an unreasonable application of, clearly established federal law and

17    was not based on an unreasonable determination of the facts in light of the

18    evidence presented, petitioner is not entitled to federal habeas relief.[22]

19    **VI.   RECOMMENDATION**

20         IT IS THEREFORE RECOMMENDED that the District Judge issue an

21    Order:  (1) approving and adopting this Report and Recommendation; and

22    (2) directing that Judgment be entered denying the Petition and dismissing this

23    action with prejudice.

24    DATED: July 6, 2011

25

26                             _____/s/_____
                             Honorable Jacqueline Chooljian
                             UNITED STATES MAGISTRATE JUDGE

27

28         [22]Nor would petitioner be entitled to federal habeas relief on this claim under a *de novo* standard of review.